CASE 44—PETITION ORDINARY—FEBRUARY 15.

# Northern Bank vs. Buford.

### APPEAL FROM BARREN CIRCUIT COURT.

1. An agreement of record by the parties "that the verdict of the majority of the jury shall be made the judgment of this court," was not a submission to arbitrators whose award should be final, but was a mere agreement to dispense with a unanimous concurrence of the jury in the verdict.

2. See the opinion for the facts showing that the verdict was not sustained by the evidence.

3. The opinion of witnesses derived from a comparison of the disputed signature with the signatures of the same parties to the pleadings, is competent evidence.

ROGERS, CRENSHAW, & DICKEY for appellant.

M. C. JOHNSON on same side.

W. SAMPSON for appellee.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

We cannot sustain the objection *in limine* to the revisability of the judgment urged in this court by the counsel of the appellee, on the ground that the jury, not being able to concur in an unanimous verdict, the parties made the following agreement on the record: "By agreement of the parties, it is ordered that the verdict of the majority of the jury shall be made the judgment of this court;" whereupon, a majority returned a verdict on which the judgment, now sought to be reversed, was rendered.

Considering the occasion and presumed object of that conventional order, we are disposed, in the absence of any other means of interpretation than the isolated entry itself, not to construe it as a submission to arbitrators, whose award, right or wrong, should be final. We can perceive no reason for presuming such a purpose or intent, nor any other object than to facilitate a verdict, as parties have often done in other cases, by agreeing to dispense with an unanimous concurrence of the jury, and to let the finding by the agreed majority be, in all respects, as effectual as it would have been if the entire jury had concurred; and that the same judgment should, conse-

quently, be rendered by the court, or, in other words, that a verdict by the majority should be entitled to the same judgment as it would have been if the twelve jurors had concurred in it. And, thus understanding the agreement, the *order* that the verdict should be made the judgment of the court should have no influence on the interpretation of the intention of the parties.

This construction of the agreement, plain as it may be on its face, is fortified, and, as we think, conclusively, by the fact that the motion for a new trial was not resisted by reference to the agreement, which would have closed the litigation of the parties, and the court had intended by it what the able argument here now tries to prove they did.

In revising the judgment, we find, as agreed by the counsel, only one question for our consideration—and that is, whether the verdict is sustained by the evidence.

This action is on a protested bill of exchange negotiated in the Louisville Branch of the Northern Bank. The appellee resisted a judgment by a two-fold defense—*non est factum*, and non-notification of protest. Neither of these defenses is, in the opinion of this court, sustained by any consistent or rational deduction from the testimony as certified by the bill of exceptions.

1. The appellee introduced only three witnesses to prove that the signature of his name was not in his hand-writing. Neither of them seemed to be very familiar with the character of his habitual signature. One of these said that the style of the signature to the bill appeared rather smoother than the appellee's usual signature, and the letters somewhat different; but that he could not say that the signature to the bill was not genuine, though it looked "like it was written by a man who can use the pen better than Buford." The other two witnesses expressed the same opinion, and concluded that the signature was not genuine.

On the other hand, a merchant, and a cashier and a clerk of the Glasgow Branch of the Northern Bank, who professed to be well acquainted with the appellee's writing, and the style of his signature especially, testified unequivocally that they

believed that the appellee's signature to the bill had been written by himself; and the two latter witnesses said that they had no doubt of its genuineness. Weighing the evidence of these six witnesses, the preponderance is decidedly against the appellee. But this preponderance is made indisputably conclusive by the cashier, who testified that appellee signed his name to the bill in his (witness's) presence, on the counter of the bank; and, in this, he is circumstantially and strongly corroborated by the clerk of the bank, and is even more fortified by the intrinsic probability that, as this bill was a renewal of another to which the appellee was a party, he would cheerfully sign, and did sign it, as thereby he might not increase his responsibility, but would insure a prolongation of indulgence.

The fact that, some months after the date of the bill, the cashier, looking into the bill-book and not finding the appellee's name entered therein as a party to this bill, told him that he was not on it, is not, when properly considered, entitled to much, if any, weight against his positive and circumstantial testimony. His explanation is, that the old bill could not be renewed until all the parties to it signed the new one; that all the other parties having signed it, their names alone were entered on the bill-book, and the bill retained for the appellee's signature; that when he afterwards signed it, his name was inadvertently not registered in the bill-book; and that when the appellee, months afterwards, inquired whether he was on the bill, he looked in the bill-book, and not finding his name there, told him that he was not on it; but he adds that, when he shortly afterwards, on the same day, had time to reflect, he remembered the whole transaction, and, not then finding the appellee, requested one of his friends to tell him that his name *was* on the bill. The truth of all this is not at all incredible, and especially as, if it be false, the cashier was guilty of perjury, and all his testimony about the genuineness of the signature was the spurious offspring of a corrupt heart.

To all this resistless mass of evidence may be added the significant fact, that, though the appellee introduced and examined his acquaintance and co-indorser, Maupin, and his intimate acquaintance and near kinsman, Trabue, he did not

ask either of them a question about his hand-writing or the genuineness of the signature of his name to the bill.

On the foregoing facts the first defense undoubtedly fails.

2. Legal notice of a legal protest is also established by a very decided preponderance of evidence.

The uncontradicted testimony of Cunningham, a notary in Louisville, proves that, on the day for presentation, he demanded payment of the bill at the Louisville Branch of the Northern Bank, and protested it for non-payment; and, on the same day, inclosed in an envelope, to the Branch Bank at Glasgow, notices of protest to Maupin and the appellee, and put the communication into the post-office in Louisville, post-paid.

It appears, without controversy, that the direct transportation of the mail from Louisville to Glasgow was suspended by the Confederate army from early in October until the 27th of February.

The cashier and clerk of the Glasgow Branch Bank both testified that, on the 27th of February, the first open mail day, they received the notices of protest which had been transmitted by Cunningham; and, on the same day, examined them carefully, and put them into the post-office at Glasgow, inclosed in envelopes, directed to Maupin and to the appellee, with a red three cent postage stamp on each. The appellee lived near Glasgow, and used that post-office. So far the testimony leaves no room for doubt of sufficient notice. But the appellee relies for rebuttal on the testimony of Dr. Johnson, who testified that the appellee, being confined at home by sickness, and the witness being his physician, he visited him once every two days, from the 26th of February to the 2d of March; that, during that time, and probably on the 2d of March, he took from the post-office a notice of the protest of the old bill, of which that now in contest was a renewal, and that the notice was inclosed in an envelope directed to the appellee, with a cent blue stamp on it. Without doubt that was no notice of the protest of the bill sued on. But does this fact, combined with the circumstance that there is no positive proof that more than one notice of protest was put into the Glasgow office directed to the appellee, prove that the cashier and clerk were

mistaken? Such a conclusion is neither logical nor legal, from all the facts. It appears, without controversy, that, during the blockade of the mail, the office at Glasgow was closed, and consequently no mail matter in it was delivered before the 27th of February. And the bank clerk testified that he knew that, some time in October, the old bill reached the Glasgow bank by an unusual route. Now, on these facts, the testimony of Johnson, and that of the cashier and clerk, may, and, we think, ought, to be harmonized as perfectly consistent. Johnson's testimony does not conflict with that of the cashier and clerk. The notice he took from the office could not have been taken out sooner than about the time he got it. And the fact, therefore, of its reception at that time, does not prove, or tend to prove, that it was the notice put into the office on the 27th of February. Nor could Johnson prove that the appellee, through some other friend or a servant, had not actually received the notice of the protest of the bill sued on. Therefore, the positive testimony of the cashier and clerk should be accredited, and especially as the cent blue stamp and the three cent red stamp prove that both the notice of the protest of the old and that of the new bill were put into the Glasgow office; and, even if the appellee never received the latter, his failure was not ascribable to the appellant's fault.

Without further elaboration or analysis, we feel constrained to the conclusion, that, although we should not set aside a verdict on a bare preponderance of evidence against it, and merely because we could not concur in it, yet there is such a destitution of probabilities to sustain it, the circuit court erred in overruling the motion for a new trial.

On the return of the cause the circuit court should admit, if reoffered, Graham. and Wood as witnesses, called to testify against appellee's signature to the bill by a comparison of it with his signatures to the pleadings in the record. Although there is yet some diversity as to the competency of such testimony, we are of the opinion that the prevalent and more authoritative doctrine favors its competency.

Wherefore, the judgment is reversed, and the cause remanded for a new trial.